IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIGIMEDIA TECH, LLC,

      Plaintiff,

  v.

GOPRO, INC.,

      Defendant.

CIVIL ACTION

NO. _____

**Jury Trial Demanded**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff DigiMedia Tech, LLC ("Plaintiff") files this Complaint for Patent Infringement against Defendant, and states as follows:

## THE PARTIES

1.     Plaintiff is a limited liability company organized and existing under the laws of the State of Georgia, having its principal office at 44 Milton Ave., Suite 254, Alpharetta, GA 30009.

2.     Defendant GoPro, Inc. ("GoPro" or "Defendant") is a corporation organized and existing under the laws of Delaware, with a place of business at 3025 Clearview Way, San Mateo, CA 94402.

## JURISDICTION AND VENUE

3.     This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) on the grounds that this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

4.      This Court has personal jurisdiction over Defendant, consistent with due process, because Defendant has minimum contacts with the State of Delaware and has purposefully availed itself of the privileges of conducting business in the State of Delaware. For example, Defendant is incorporated in Delaware. Further, on information and belief, Defendant has sold or offered to sell infringing products in the State of Delaware and in this Judicial District, or has manufactured accused products and provided them to intermediaries for distribution throughout the country, including in the State of Delaware and this Judicial District, with knowledge of this distribution.

5.      Venue is proper in this Court as to Defendant pursuant to 28 U.S.C. § 1400(b) because Defendant resides in this Judicial District.

**FACTUAL BACKGROUND**

***Plaintiff's Effort to Resolve Its Dispute with Defendant Outside of Court***

6.      Plaintiff, via its licensing agent, first contacted Defendant about its patent portfolio by letter dated March 2, 2020, informing Defendant about its portfolio of over 110 active issued patents and inviting Defendant to engage in a dialogue regarding a license to the portfolio prior to any potential enforcement action.

7.      After receiving no response, Plaintiff followed up with a letter from its counsel to Defendant dated April 17, 2020. This letter again invited Defendant to engage in licensing discussions and also included sample claims charts showing how Defendant's products infringed two of the patents asserted in this case, U.S. Patent No. 6,545,706 and U.S. Patent No. 7,715,476.

8.      After again receiving no response, Plaintiff, through counsel, sent Defendant another letter dated December 2, 2020. This letter identified several patents owned by Plaintiff

that Defendant's products infringed, including all six patents asserted in this case. Plaintiff

provided sample claim charts for these patents.

9.      Still receiving no response, Plaintiff's counsel followed up with emails dated

January 12, 2021, and January 20, 2021. Defendant never responded to these outreaches.

***The '476 Patent***

10.     Plaintiff is the owner by assignment of all right, title, and interest in and to United

States Patent No. 7,715,476, entitled "System, Method and Article of Manufacture for Tracking a

Head of a Camera-Generated Image of a Person" ("the '476 patent"), including the right to sue

for all past, present, and future infringement, which assignment was duly recorded in the

USPTO.

11.     A true and correct copy of the '476 patent is attached hereto as Exhibit A. The

'476 patent is incorporated herein by reference.

12.     The application that became the '476 patent was filed on April 21, 2005.

13.     The '476 patent claims priority to an application filed on July 30, 1999.

14.     The '476 patent issued on May 11, 2010, after a full and fair examination by the

USPTO.

15.     The '476 patent is and is legally presumed to be valid, enforceable and directed to

patent-eligible subject matter.

16.     The elements recited in the asserted claims of the '476 patent were not well-

understood, routine, or conventional when the application that became the '476 patent was filed.

17.     The '476 patent states that "[t]he present invention relates to displaying video

images generated by a camera on a display, and more particularly to tracking a head portion of a

person image in camera-generated video images." '476 patent at 1:41-44. The '476 patent observes that it is important to track a head portion of the user image since this specific body part is often the focus of the most attention. '476 patent at 1:63-65.

18.     The '476 patent identifies a problem in the state of the art as it existed at the time of filing: "Many difficulties arise, however, during the process of identifying the current position of the head portion of the user image. It is often very difficult to discern the head portion when relying on a single technique. For example, when identifying the location of a head portion using shape, color, motion etc., portions of the background image and the remaining body parts of the user image may be confused with the head. For example, a flesh coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

19.     The claims of the '476 patent are directed to technical solutions to the technical problem of how to identify a head in an image, and in particular a solution to the problem in the state of the art identified by the '476 patent. One of various reasons this is important is to assist in focusing a digital camera. Since many camera users are not trained in how to properly focus a camera, and because many photographs are candid shots of moving subjects, the problem calls for technical solutions. The '476 patent discloses and claims such technical solutions.

20.     For example, the '476 patent recognized that while a number of different techniques could be used to identify a head portion of a subject in an image, no single technique is foolproof. Thus, the '476 patent discloses applying at least two techniques to identify a head portion and basing the detection of heads on the results of the two techniques. This approach overcomes a problem that any particular technique may be fooled by or rendered inapplicable by particular circumstances (e.g., lighting conditions, orientation of the subject to the camera, etc.).

*See, e.g.,* '476 patent at 5:36-53 ("The first confidence value and the second confidence value may then be made available for use by various applications in operation **204**. Such applications may decide whether the head portion of the person image has moved based on the confidence values. Logic such as an AND operation, an OR operation, or any other more sophisticated logic may be employed to decide whether the results of the first head tracking operation and/or the second head tracking operation are indicative of true head movement. For example, if at least one of the head tracking operations indicates a high confidence of head movement, it may be decided to assume that the head has moved. On the other hand, if both head tracking operations indicate a medium confidence of movement, it may be assumed with similar certainty that the head has moved. If it is decided to assume that the head has moved, an interaction may be shown between the video images generated by the camera and the virtual computer-generated environment."); *see also* '476 patent at 6:66-7:7.

21.    For example, claim 13 (which depends from and incorporates the elements of claim 1) of the '476 patent claims:

> 1. A method performed by a computer for processing images to identify a head portion of a subject in the images comprising:
>
> obtaining images of a subject;
>
> generating, by the computer, a first confidence value representing a confidence that a first process has identified a location of a head portion of the subject in the images;
>
> generating, by the computer, a second confidence value representing a confidence that a second, different process has identified the location of the head portion of the subject in the images; and

identifying, by the computer, the location of the head portion of the
subject in the images based at least in part on the first confidence
value and the second confidence value.

13. A method as recited in claim 1, wherein the first process
includes identifying a point of separation between the head portion
and a torso portion.

22.     The steps set forth in claim 13 of the '476 patent provide a technical solution to

the technical problem of head portion focus. Claim 13 does not merely claim a result. Rather, in

keeping with the nature of method claims, claim 13 recites steps. Those steps do not merely

claim the technical benefit (or results) of the inventions disclosed in the '476 patent. Rather,

claim 13 recites steps that, if performed, will result in those technical benefits. For example,

claim 13 recites steps that, if performed, will address at least the following issue with the state of

the art identified in the '476 patent: "Many difficulties arise, however, during the process of

identifying the current position of the head portion of the user image. It is often very difficult to

discern the head portion when relying on a single technique. For example, when identifying the

location of a head portion using shape, color, motion etc., portions of the background image and

the remaining body parts of the user image may be confused with the head. For example, a flesh

coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

23.     Moreover, the specification of the '476 patent contains a great deal of additional

detail regarding preferred embodiments for practicing the claimed invention. '476 patent at 4:56-

11:9, including preferred embodiments of processes for identifying head portions in images. This

additional description would help a person of ordinary skill in the art understand and implement

the technological solutions claimed in the '476 patent.

24.     Other claims of the '476 patent recite additional features that provide further technological benefits. For example, claim 5 of the '476 patent recites "wherein the first process includes analyzing pixels within a search window, wherein the search window is created based on a previously identified head portion." As an additional example, claim 11 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution are used to identify a person image." As a further example, claim 12 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution in the context of a previously identified person image are used to identify a person image."

25.     The steps set forth in the claims of the '476 patent constitute patent-eligible subject matter, are not directed to an abstract idea, law of nature, or natural phenomenon, and contain one or more inventive concepts for focusing a digital camera.

26.     The steps set forth in the claims of the '476 patent were not well-understood, routine, or conventional at the time of the invention. This is evidenced by the fact that the inventors of the '476 patent submitted sworn declarations, subject to penalty for willful false statements, that "I believe that I am . . . an original, first and joint inventor . . . of the subject matter which is claimed and for which a patent is sought on the invention."

27.     That the invention recited in claims 5, 11, 12, and 13 of the '476 patent were not well-understood, routine, or conventional at the time the '476 patent was filed is also evidenced by the Examiner's actions in the prosecution of the '476 patent.

28.     The Examiner who examined the '476 patent (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to

define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims. *See* Exhibit M.

29.    The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

30.    The Examiner initially rejected application claims 1-33 under 35 U.S.C. § 101. The applicants overcame these rejections by addressing the Examiner's concerns regarding § 101. The applicants also overcame other rejections by the Examiner over the art of record, prompting the Examiner to allow claims 5, 11, 12, and 13 of the '476 patent (among others).

31.    The Examiner allowed claims 5, 11, 12, and 13 of the '476 patent after a full and fair investigation. Had the Examiner determined, after his review of the art of record and his knowledge of the state of the art, that the subject matter recited in claims 5, 11, 12, and 13 was well-understood, routine, or conventional at the time of the invention, he would not have allowed the claims to issue.

32.    The significance of the inventiveness of the '476 patent is illustrated by the fact that it or a family member has been cited in 157 other patent applications, including the following patents and published patent applications: JP4157234B2; US8711217B2; US8564661B2; US9892606B2; US20050162515A1; US7020305B2; US20020085738A1; US7424175B2; US8457401B2; US20020171742A1; US6870945B2; US8300042B2; US7259747B2; US8035612B2; US6968085B2; US20030107650A1; US7710391B2;

US7161579B2; US8947347B2; US7623115B2; US8797260B2; US7102615B2; US7646372B2;

US7883415B2; US7760248B2; US7803050B2; US8570378B2; US9393487B2; US8686939B2;

US7854655B2; US9474968B2; US8313380B2; US8139793B2; US7627139B2; US8233642B2;

US7850526B2; US8160269B2; US9174119B2; US7918733B2; US9682319B2; US7134080B2;

JP4240957B2; JP4318465B2; WO2004055776A1; US9177387B2; US7505862B2;

US8072470B2; US8498452B2; US8593542B2; US7565030B2; US7440593B1; US8989453B2;

US8155397B2; US8330831B2; US7574016B2; US9692964B2; US8948468B2; US9129381B2;

US8896725B2; US7792970B2; US7269292B2; US8494286B2; US7471846B2; US7844076B2;

US7620218B2; US8682097B2; US20070223732A1; US9573056B2; US8287373B2;

US7874917B2; US8323106B2; US10279254B2; WO2005041579A2; CN1902930B;

US7663689B2; US8345918B2; GB2414615A; US8547401B2; US8320641B2; US7386150B2;

US8503800B2; US7315631B1; US9128519B1; JP4654773B2; US8081822B1; US7796780B2;

US8098277B1; US20070133940A1; US8265392B2; US8265349B2; US8150155B2;

KR100660725B1; US20110014981A1; AT497218T; WO2008017051A2; US7403643B2;

US7916897B2; US8310656B2; US8781151B2; USRE48417E1; AU2006252252B2;

US8055067B2; US8300890B1; WO2008104549A2; WO2008107002A1; US20080232696A1;

US20080252596A1; JP2008282085A; US7916971B2; US8702430B2; US8221290B2;

US8360904B2; KR100904846B1; WO2009035705A1; US8159682B2; US8542907B2;

WO2009094646A2; CN103258184B; US8340379B2; US8259163B2; US8368753B2;

US7855737B2; US8595218B2; US20090312629A1; JP5547730B2; US8961313B2;

US11464578B2; US8690776B2; US8641621B2; US8554307B2; US8527657B2;

US8342963B2; US8393964B2; US8142288B2; US8379917B2; US8787663B2; US9582707B2;

US9100574B2; US8670816B2; JP6222795B2; US10314559B2; US10347100B2; US9901406B2; US10188467B2; US10853625B2; US10551913B2; WO2016181469A1; JP6566028B2; US9949700B2; US9675319B1; US10278778B2; US11259879B2; US10469590B2; US11484365B2; US11037316B2; US11205274B2; and JP6973258B2.

33.    These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the invention claimed and disclosed in the '476 patent was not well-understood, routine, or conventional at the time of the invention.

***The '706 Patent***

34.    Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,545,706, entitled "System, Method and Article of Manufacture for Tracking a Head of a Camera-Generated Image of a Person" ("the '706 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

35.    A true and correct copy of the '706 patent is attached hereto as Exhibit B. The '706 patent is incorporated herein by reference.

36.    The application that became the '706 patent was filed on July 30, 1999.

37.    The '706 patent issued on April 8, 2008, after a full and fair examination by the USPTO.

38.    The '706 patent is valid and enforceable and directed to eligible subject matter.

39.    The elements recited in the asserted claims of the '706 patent were not well-understood, routine, or conventional when the application that became the '706 patent was filed.

40.    The claims of the '706 patent are directed to technical solutions to the technical problem of how to identify a head in an image for the same reasons discussed above regarding the '476 patent, to which the '706 patent is related.

**The '086 Patent**

41.    Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,567,086, entitled "Immersive Video System Using Multiple Video Streams" ("the '086 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

42.    A true and correct copy of the '086 patent is attached hereto as Exhibit C. The '086 patent is incorporated herein by reference.

43.    The application that became the '086 patent was filed on July 25, 2000.

44.    The '086 patent issued on May 20, 2003, after a full and fair examination by the USPTO.

45.    The '086 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

46.    The elements recited in the claims of the '086 patent were not well-understood, routine, or conventional when the application that became the '086 patent was filed.

47.    The '086 patent identifies technological shortcomings existing in the art prior to the '086 patent. *See, e.g.*, '086 patent at 2:48-67; 4:7-12. As expressed in the '086 patent, the inventions disclosed and claimed in the '086 patent overcome such technological shortcomings. *Id*. at 3:1-22; 4:12-17; 9:36-44. The Detailed Description of the '086 patent contains additional

detail that would assist a person of ordinary skill in the art in understanding the scope of the claimed invention and to implement them without undue experimentation. *Id*. at 4:17-9:34.

48.    The claims of the '086 patent are directed to technical solutions to the technical problem of how to increase the resolution and quality of immersive video for environment display systems that use multiple video streams and conventional video components. One of the reasons this is important is that, for camera systems with 360 degrees of view, users may prefer to view video at different angles with higher resolution. The video display system may not "know" or be set to a preferred angle for the users when the camera system starts processing video.

49.    Supporting higher resolution views for user selectable angles from a camera system with a 360-degree field of view calls for technical solutions. The '086 patent discloses and claims such technical solutions. For example, an immersive video system can produce a plurality of video streams using associated environment data, and a user can select a preferred video stream. First environment data, such as camera settings, can be shared between the plurality of video streams to reduce data processing or data storage requirements. Second environment data can be for a first video stream, where the second environment data does not overlap another video stream. This approach overcomes a problem in which using the same environment data for all views results in lower quality. Consequently, the technology in the '086 patent enables both efficient operation while also supporting preferred user features, such as selecting a view angle with higher resolution from the 360-degree field of view.

50.     The steps recited in the claims of the '086 patent provide a technical solution to the technical problem of supporting high quality views for user selectable angles from a camera system with a 360-degree field of view.

51.     For example, claim 24 of the '086 patent recites the following:

24. A method of displaying a view window of an environment from a plurality of video streams, wherein each video stream includes environment data for recreating different viewable ranges of the environment, the method comprising:

selecting an active video stream from the plurality of video streams;

decoding the active video stream; and

generating an image for the view window using the active video stream.

52.     The claimed set of steps set forth in the claims of the '086 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for accomplishing the goal of accurate and automated information exchange.

53.     This claimed set of steps was not well-understood, routine, or conventional at the time of the invention. This is evidenced, for example, by the '086 patent's assertions, including those referenced herein, that the disclosed and claimed inventions improved upon technological shortcomings in the existing art.

54.     That the claimed set of steps was not well-understood, routine, or conventional at the time of the invention is further evidenced by the fact that the inventor of the '086 patent submitted a sworn declaration, subject to penalty for willful false statements, that "I believe I am the original, first and sole inventor . . . of subject matter . . . that is disclosed and/or claimed and

for which a patent is solicited by way of the application entitled 'Video System Using Multiple

Video Streams.'"

55.     That the claimed set of steps was not well-understood, routine, or conventional at

the time of the invention is further evidenced by the prosecution history of the '086 patent. The

U.S. Patent & Trademark Office has stated that the duties of a Patent Examiner include the

following:

> • Reads and understands the invention set forth in the specification
> • Determines whether the application is adequate to define the metes and bounds of the claimed invention
> • Determines the scope of the claims
> • Searches existing technology for claimed invention
> • Determines patentability of the claimed invention

Exhibit M at 11, *The Role of the Patent Examiner*, Sue A. Purvis, Innovation and Outreach

Coordinator, USPTO, available at

https://www.uspto.gov/sites/default/files/about/offices/ous/04082013_StonyBrookU.pdf.

56.     Thus, the Examiner who examined the '086 patent, in accordance with his duties,

(1) read and understood the invention set forth in the specification; (2) determined whether the

application was adequate to define the metes and bounds of the claimed invention; (3)

determined the scope of the claims; (4) searched existing technology for the inventions recited in

the claims of the application; and (5) determined the patentability of the claims.

57.     The Examiner performed these duties in his role as "advocate/protector of [the]

public interest with respect to intellectual property," which involves a "cooperative investigation

between the Examiner and the Applicant, which ensures an Applicant receives a patent only for

that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

58. After conducting an examination of the claims of the application underlying the '086 patent, the Examiner determined that the claims of the '086 patent were allowable over the art of record, including, for example, U.S. Patent No. 6,360,000. As set forth above, the '086 patent identifies shortcomings in the prior art. Had the Examiner determined that the claims of the '086 patent merely recited well-understood, routine, or conventional components, he would not have allowed the claims over the art of record. The fact that the Examiner did allow the claims shows that he did not determine that the claims of the '086 patent merely recited well-understood, routine, or conventional components.

59. The significance of the inventiveness of the '086 patent is illustrated by the fact that it has been cited in 27 other patent applications, including the following patents and published patent applications: US20030016228A1; US6654019B2; US6747647B2; US20040169663A1; US20060248570A1; US20060268102A1; US20070126932A1; US20070126864A1; US20070126938A1; US20070141545A1; US20070174010A1; US20080018792A1; US20080288876A1; US20090067813A1; US20090184981A1; US20100017047A1; US20140229609A1; CN104244019A; US9183560B2; US20160156705A1; US20170084073A1; US20170084086A1; WO2018046705A3; WO2018223241A1; EP3440843A4; US10616551B2; and US10628019B2.

***The '250 Patent***

60. Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,741,250, entitled "Method and System for Generation of Multiple Viewpoints into a Scene Viewed by Motionless Cameras and for Presentation of a View Path"

("the '250 patent"), including the right to sue for all past, present, and future infringement, which

assignment was duly recorded in the USPTO.

61.     A true and correct copy of the '250 patent is attached hereto as Exhibit D. The

'250 patent is incorporated herein by reference.

62.     The application that became the '250 patent was filed on October 17, 2001.

63.     The '250 patent issued on May 25, 2004, after a full and fair examination by the

USPTO.

64.     The '250 patent is and is legally presumed to be valid, enforceable, and directed

to patent-eligible subject matter.

65.     The elements recited in the claims of the '250 patent were not well-understood,

routine, or conventional when the application that became the '250 patent was filed.

66.     The '250 patent identifies shortcomings in the art as it existed before the '250

patent. *See, e.g.,* '250 patent at 2:20-37; 2:45-58. The '250 patent also identifies desirable

improvements to the existing art. *Id*. at 2:38-44; 2:59-62. The '250 patent improves upon these

shortcomings in the art as it existed prior to the invention of the technical solutions disclosed and

claimed in the '250 patent.

67.     The claims of the '250 patent are directed to technical solutions to the technical

problem of using a camera system to provide a view path through one or more video segments to

determine which video frames in the video segments are used to generate a view. One of the

reasons this is important is that users of camera systems with a wide field of view may prefer to

select and view (or have selected for them) only portions of the supported wide field of view.

The field of view may be sufficiently wide to create distorted images. Users may prefer portions

16

with reduced distortion, which calls for technical solutions. The '250 patent discloses and claims such technical solutions. The camera system can record a video stream over a wide field of view. The camera system and/or a user can designate a portion of the video stream to be a video segment and subsequently designate a view path through the video segment. Consequently, the technology in the '250 patent enables the view of portions of the camera system's wide field of view with reduced distortion.

68.    For example, claim 1 of the '250 patent claims:

1. A method of:

recording a video stream comprising a plurality of frames, wherein said plurality of frames define a plurality of distorted images;

designating a portion of said video stream to be a video segment; and

specifying a view path through said video segment.

69.    The set of steps recited in claim 1 of the '250 patent provides a technical solution to the technical problem of providing view paths without distortion.

70.    The claimed set of steps set forth in the '250 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for providing view paths without distortion.

71.    This claimed set of steps was not well-understood, routine, or conventional at the time of the invention. This is evidenced, for example, by the '250 patent's assertions, including those referenced herein, that the disclosed and claimed inventions improved upon technological shortcomings in the existing art.

72.    That the claimed set of steps was not well-understood, routine, or conventional at the time of the invention is further evidenced by the fact that the inventors of the '250 patent

17

submitted sworn declarations, subject to penalty for willful false statements, that "I/we believe that I/we am/are the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought."

73.     That the claimed set of steps was not well-understood, routine, or conventional at the time of the invention is further evidenced by the prosecution history of the '250 patent. The U.S. Patent & Trademark Office has stated that the duties of a Patent Examiner include the following:

• Reads and understands the invention set forth in the specification

• Determines whether the application is adequate to define the metes and bounds of the claimed invention

• Determines the scope of the claims

• Searches existing technology for claimed invention

• Determines patentability of the claimed invention

Exhibit M at 11, The Role of the Patent Examiner, Sue A. Purvis, Innovation and Outreach Coordinator, USPTO, available at https://www.uspto.gov/sites/default/files/about/offices/ous/04082013_StonyBrookU.pdf.

74.     Thus, the Examiner who examined the '250 patent, in accordance with his duties, (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

75.     The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation

18

between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id*. at 8-9.

76.     After conducting an examination of the claims of the application underlying the '250 patent, the Examiner determined that the claims of the '250 patent were allowable over the art of record. As set forth above, the '250 patent identifies shortcomings in the prior art. Had the Examiner determined that the claims of the '250 patent merely recited well-understood, routine, or conventional components, he would not have allowed the claims over the art of record. The fact that the Examiner did allow the claims shows that he did not determine that the claims of the '250 patent merely recited well-understood, routine, or conventional components.

77.     The significance of the inventiveness of the '250 patent is illustrated by the fact that it has been cited in 153 other patent applications, including the following patents and published patent applications: US20020196327A1; US20030193562A1; US20030234866A1; US20040001137A1; US20040233222A1; US20040263636A1; US20040263611A1; US20040263646A1; US20040267521A1; US20050018687A1; US20050046626A1; US20050046703A1; US20050117034A1; US20050117015A1; US20050122393A1; US20050151837A1; US20050180656A1; US20050190768A1; US20050206659A1; US20050243167A1; US20050243168A1; US20050243166A1; US20050280700A1; US20050285943A1; US20060023075A1; US20060022962A1; US20060092269A1; US7108378B1;  US20060268102A1; US20070022379A1; US20070058879A1; US20070124783A1; US20070156924A1; US20070165007A1; US7260257B2; US20070299912A1; US20070299710A1; US20070300165A1; US20080008458A1; US20080049123A1; US20080068352A1; US20080117296A1; US20080129700A1;

US20080291279A1; US20080317451A1; US20090079740A1; US20090160801A1; US7593057B2; US20090305803A1; US7643006B2; US20100110005A1; US20100254670A1; WO2010127418A1; US20110043628A1; US20110095977A1; US20110128387A1; USRE42794E1; US8055022B2; US20110298917A1; US8089462B2; USRE43084E1; US8094137B2; US8115753B2; US8120596B2; US8149221B2; US8274496B2; US8289299B2; US8384693B2; US20130063427A1; US8405636B2; US8432377B2; US8456447B2; US8456418B2; US8508508B2; US8692768B2; US8902193B2; US20150042815A1; US9294757B1; US9591272B2; US9646444B2; US9674181B2; US20170214889A1; US9942520B2; US10129569B2; US10156706B2; WO2019017695A1; US10225479B2; US10230898B2; US10250889B1; US10250797B2; US10281979B2; US10284780B2; US10288840B2; US10288897B2; US10288896B2; US10291845B2; US10371928B2; US10379371B2; US10488631B2; US10534153B2; US10578948B2; US10615513B2; US10616484B2; US10635931B2; US10645286B2; US10694168B2; US10706518B2; US10845565B2; US10871561B2; US10884321B2; US10904512B2; USRE48444E1; US10951834B2; US10951859B2; US10955546B2; US10976567B2; US11037364B2; US11272154B2; US11268829B2; US11277596B2; US11287081B2; US11315276B2; US11333955B2; US11363180B2; US11368631B1; US11378682B2; US11506778B2; US11525910B2; US11531209B2; US11635596B2; US11637977B2; US11640047B2; US11659135B2; US11693064B2; US11770618B2; US11770609B2; US11832018B2; US11900966B2; US11910089B2; US11949976B2; US11946775B2; and US11962901B2.

**The '287 Patent**

78.    Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,606,287 entitled "Method and Apparatus for Compression Rate Selection" ("the '287 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

79.    A true and correct copy of the '287 patent is attached hereto as Exhibit E. The '287 patent is incorporated herein by reference.

80.    The application that became the '287 patent was filed on November 29, 2000.

81.    The '287 patent issued on August 12, 2003, after a full and fair examination by the USPTO.

82.    The '287 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

83.    The elements recited in the asserted claims of the '287 patent were not well-understood, routine, or conventional when the application that became the '287 patent was filed.

84.    The '287 patent observes that various forms of entertainment devices have appeal to users, and that many users "prefer to use all of these modes of entertainment from time to time." '287 patent at 1:27-31. The '287 patent goes on to note that this not only requires a lot of space, but because "a plurality of users in a household each desire to enjoy one or more of these modes of entertainment simultaneously and in disparate locations," many people have more than one of various types of devices. *Id*. at 1:39-53.

85.    The '287 patent observes that "[m]edia signals are frequently compressed. '287 patent at 2:10. It also contains a section titled "Limitations of Prior Art," in which the '287 patent disparages the state of the prior art: "Prior art solutions require a user to select a compression rate

before the media signal is recorded. However, the maximum compression rate achievable without unacceptable loss of media signal quality, termed the 'optimal compression rate,' varies. Thus, users frequently select sub-optimal compression rates. If a user selects a lower compression rate than the optimal compression rate, more storage space is used to store the media signal than is required. Additionally, if a user selects a higher compression rate than the optimal compression rate, the signal quality of the stored media signal is unacceptable." '287 patent at 2:10-26.

86.    The claims of the '287 patent are directed to technical solutions to the technical problem of video compression rate selection. One of the reasons this is important is the rate selection for video compression should reduce the stored file size or bandwidth requirements while maintaining high quality for the video. The media devices can operate in a networked manner and share the compressed video over the network. Higher video compression rates reduce network bandwidth or file storage requirements, but also reduce video quality. The selection of an optimal or preferred video compression rate that maintains sufficient quality for sharing video over the network calls for technical solutions. The '287 patent discloses and claims such technical solutions. For example, the '287 patent recognized that multiple data items can be associated with the video input, and a maximum compression rate can be determined from the data items. The video can be compressed at the maximum compression rate and stored. The media device can operate as client in a client/server architecture for storing the compressed video. This approach overcomes problems for video compression rates that result in either larger file sizes than necessary or unacceptable video quality. Consequently, the technology in the '287

patent enables media devices to compress video at sufficient quality for storing in a network with bandwidth and storage limitations.

87.     The sequence of steps set forth in the asserted claims of the '287 patent provide a technical solution to the technical problem of determining a video compression rate for media devices to store video in a communications network.

88.     Specifically, by reciting the following steps, asserted claim 1 of the '287 patent is directed to a technological solution to a technological problem as disclosed in the '287 patent:

> 1. A method for recording a media signal comprising:
>
> generating one or more data items wherein said data items are associated with said media signal;
>
> determining a maximum compression rate from said data items wherein recording said media signal compressed at said maximum compression rate does not result in an unacceptable loss of quality of said media signal;
>
> compressing said media signal at said maximum rate into a compressed media signal; and
>
> storing said compressed media signal, wherein said step of determining is performed at a client in a client/server architecture.

89.     The claimed sequence of steps set forth in the '287 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for accomplishing the goal of accurate and automated information exchange. Claim 1 does not merely claim a result. Rather, in keeping with the nature of method claims, claim 1 recites steps. Those steps do not merely claim the technical benefit (or results) of the inventions disclosed in the '287 patent. Rather, claim 1 recites steps that, if performed, will result in those technical benefits. For example, the steps recited in claim 1, if performed, will improve at least the following issue with the state of the art described

in the '287 patent: "Prior art solutions require a user to select a compression rate before the media signal is recorded. However, the maximum compression rate achievable without unacceptable loss of media signal quality, termed the 'optimal compression rate,' varies. Thus, users frequently select sub-optimal compression rates. If a user selects a lower compression rate than the optimal compression rate, more storage space is used to store the media signal than is required. Additionally, if a user selects a higher compression rate than the optimal compression rate, the signal quality of the stored media signal is unacceptable." '287 patent at 2:10-26.

90.    Moreover, the specification of the '287 patent contains a great deal of additional detail regarding preferred embodiments for practicing the claimed invention. '287 patent at 3:1-7:8. In particular, the '287 patent includes a section titled "Compression Rate Selection," in which it identifies preferred techniques for selecting a maximum compression rate.

91.    This claimed sequence was not well-understood, routine, or conventional at the time of the invention. This is evidenced by the fact that the inventors of the '287 patent submitted sworn declarations, subject to penalty for willful false statements, that they "believe we are the inventors of the subject matter which is claimed and for which a patent is sought."

92.    That the invention recited in claim 1 of the '287 patent was not well-understood, routine, or conventional at the time the '287 patent was filed is also evidenced by the Examiner's actions in the prosecution of the '287 patent.

93.    The Examiner who examined the '287 patent, in accordance with his duties, (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3)

determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

94.     The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." Ex. M at 8-9.

95.     The Examiner who examined the '287 patent rejected the claims of the application, making rejections over U.S. Patent No. 6,339,568; U.S. Patent No. 6,243,139; and U.S. Patent No. 6,310,848. However, the Examiner indicated that application claim 6 would be allowable if rewritten in independent form. The applicants then submitted an amendment amending claim 6 to place it in independent form. The Examiner then allowed the claim and it issued as claim 1 of the '287 patent.

96.     The Examiner allowed claim 1 of the '287 patent after a full and fair investigation. Had the Examiner determined, after his review of the art of record and his knowledge of the state of the art, that the subject matter recited in claim 1 was well-understood, routine, or conventional at the time of the invention, he would not have allowed the claim to issue.

97.     The significance of the inventiveness of the '287 patent is illustrated by the fact that it or a family member has been cited in 13 other patent applications, including the following patents and published patent applications: US20030204519A1; US20050117475A1; US20060095657A1; US20060112138A1; US20110145447A1; US9570103B2; US8867904B2;

US7295753B2; WO2004021695A1; US7474832B2; WO2004107756A1; US7508609B2; and JP2008154132A.

***The '818 Patent***

98.    Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,744,818, entitled "Method and Apparatus for Visual Perception Encoding" ("the '818 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

99.    A true and correct copy of the '818 patent is attached hereto as Exhibit F. The '818 patent is incorporated herein by reference.

100.    The application that became the '818 patent was filed on December 27, 2000.

101.    The '818 patent issued on June 1, 2004, after a full and fair examination by the USPTO.

102.    The '818 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

103.    The elements recited in the asserted claims of the '818 patent were not well-understood, routine, or conventional when the application that became the '818 patent was filed.

104.    As background for the disclosed and claimed invention, the '818 patent explains that "There a three types of redundancy in video signals that are related to the picture within the video. These are structural, statistical and perceptual redundancy." '818 patent at 1:11-13.

105.    The '818 patent further states that "Standard compression systems, such as the various forms of MPEG, H-compression, etc., mainly reduce structural and statistical redundancy." *Id.* at 1:13-16.

106.    The claims of the '818 patent are directed to technical solutions to the technical problem of reducing perceptual redundancy. One of the reasons this is important is for storing video in a compressed format, where the compression should also support subsequent viewing of the video at high quality. Since video streaming services must balance the competing features of both high-quality video and limited or practical video file sizes, the problem calls for technical solutions. The '818 patent discloses and claims such technical solutions.

107.    For example, the '818 patent recognized that video encoding can compress the source video input with a visual perception estimator and a perception threshold, disclosing a video encoding system that "generally reduces perceptual redundancy in video streams and may comprise a visual perception threshold estimator **10**, a compression dependent threshold determiner **12**, a filter unit **14** and a structural and statistical encoder **16**." *Id*. at 1:65-2:3.

108.    The '818 patent discloses a number of techniques which include (i) a compression dependent threshold estimator using the perception threshold and (ii) a filter for pixels using the compression dependent threshold. Consequently, the technology in the '818 patent enables smaller video file sizes for a specified level of video quality. This improved the operation of prior-art computing technology.

109.    This technological improvement on the prior art is recited in the claims of the '818 patent, including claims 1, 2, and 5 of the '818 patent:

> 1. A video encoding system comprising:
>
> a visual perception estimator adapted to estimate a perception threshold for a pixel of a current frame of a videostream;
>
> an encoder adapted to encode said current frame;
>
> a compression dependent threshold estimator adapted to estimate a

compression dependent threshold for said pixel at least from said perception threshold and information from said encoder; and

a filter unit adapted to filter said pixel at least according to said compression dependent threshold.

2. A system according to claim 1 and wherein said compression dependent threshold estimator also estimates at least one parameter from the following group of parameters:

whether or not a new frame NwFr has been defined by said encoder as an I frame;

whether an ith pixel is in the foreground FG or the background BG of a picture;

whether an ith pixel forms part of an edge Ed around an object in the picture;

whether or not the ith pixel forms part of a single detail SD;

whether or not the ith pixel is part of a group Gr of generally periodic details;

the contrast level Lv of the detail for the ith pixel;

the duration $\tau$ of a detail within a picture;

how full said encoder is; and the distance DP of the ith pixel from the center of the frame.

5. A system according to claim 1 and wherein said filter unit is a non-linear filter.

110.    The video encoding systems set forth in the claims of the '818 patent provide a technical solution to the technical problem of reducing perceptual redundancy independent of other video compression techniques.

111.    The claimed sequence of steps set forth in the claims constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for balancing the competing features of both high-quality video and limited or practical video file sizes.

112.    This claimed sequence was not well-understood, routine, or conventional at the time of the invention.

113.    The '818 patent provides additional context for the invention recited in claim 1, including preferred embodiments for implementing it. For example, the Detailed Description section of the '818 patent spans more than seven columns and twelve figures providing significant technical detail on at least three preferred embodiments for implementing the inventions recited in the claims of the '818 patent. *Id.* at 1:60-9:43; *see also id.* at 1:63-65 (indicating that Fig. 1 "illustrates a video encoding system, constructed and operative in accordance with a preferred embodiment of the invention"); *id.* at 6:56-58 (indicating that Figures 8 and 9 " present an alternative embodiment of the filter unit"); *id.* at 8:63-65 (indicating that Figs. 11 and 12 "illustrate an alternative embodiment of the present invention"). The description of these preferred embodiments provides additional confirmation that the inventions recited in, for example, claims 1, 2, and 5 are directed to technical solutions to technological problems in the existing state of the art.

114.    The claims of the '818 patent do not preempt all techniques for reducing perceptual redundancy. For example, the claims of the '818 patent do not preempt techniques for reducing perceptual redundancy that do not involve a compression dependent threshold estimator with a perception threshold. The '818 patent specifically identifies one such other technique.

'818 patent at 1:16-20 ("U.S. patent application Ser. No. 09/524,618) assigned to the common assignee of the present invention and incorporated herein by reference, attempts to reduce perceptual redundancy independent of whatever other video compression might be used afterward.").

115.    The Examiner who examined the '818 patent, in accordance with his duties, (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

116.    The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." Ex. M at 8-9.

117.    After conducting an examination of the claims of the application underlying the '818 patent, the Examiner determined that the claims of the '818 patent were allowable over the art of record. As set forth above, the '818 patent identifies shortcomings in the prior art. Had the Examiner determined that the claims of the '818 patent merely recited well-understood, routine, or conventional components, he would not have allowed the claims over the art of record. The fact that the Examiner did allow the claims shows that he did not determine that the claims of the '818 patent merely recited well-understood, routine, or conventional components.

118.    The significance of the inventiveness of the '818 patent is illustrated by the fact that it or a family member has been cited in 21 other patent applications, including the following

U.S. patents and published patent applications: US20020158988A1, US20050052446A1, US20050270265A1, US20060001659A1, US20060001658A1, US20060001660A1, US20060020906A1, US20060236893A1, US20060251170A1, US20060250525A1, US20070002035A1, US20070076803A1, US20100026735A1, US20110222597A1, US6753929B1, US20040131117A1, US7639892B2, US7903902B2, and US7526142B2. These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the invention claimed and disclosed in the '818 patent was not well-understood, routine, or conventional at the time of the invention.

## COUNT I – INFRINGEMENT OF THE '476 PATENT

119.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

120.    Defendant has directly infringed one or more claims of the '476 patent. For example, Defendant has infringed at least claim 13 of the '476 patent, either literally or under the doctrine of equivalents, in connection with at least its GoPro Hero 7 and Hero 8, as detailed in the preliminary claim chart attached hereto as Exhibit G and incorporated herein by reference.

121.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '476 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities described herein on the performance of that step as disclosed in Exhibit G. The accused functionality relates to the head-tracking functionality and corresponding hardware of the accused products (e.g., Defendant's GoPro Hero 7 and Hero 8), as set forth in Exhibit G. For

example, on information and belief, a user could not use the functionality of the accused instrumentality as described in Exhibit G without performance of the steps recited in claim 13 of the '476 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit G. In other words, for a user to utilize the functionality described in Exhibit G, the steps of claim 13 of the '476 patent had to be performed in the manner described in Exhibit G. Otherwise, the head-tracking functionality of Defendant's accused instrumentalities (and the corresponding benefit) would not have been available to users.

122.    Additionally, Defendant's affirmative acts of selling the accused products, causing the accused products to be sold, advertised, offered for sale, and/or distributed, and providing instruction, marketing, and/or installation materials for the accused products have induced Defendant's customers and/or end-users to use the accused products in their normal and customary way to infringe the '476 patent. Defendant specifically intended and was aware that these normal and customary activities would infringe the '476 patent. In addition, on information and belief, Defendant provided marketing, instructional, and/or installation materials that specifically taught end-users to use the accused products in an infringing manner. By way of example only, Defendant has induced infringement of at least the specific claims of the '476 patent identified above by selling in the United States, without Plaintiff's authority, infringing products and providing instructional, marketing, and/or installation materials. These actions have induced and continue to induce the direct infringement of the '476 patent by end-users. Defendant performed acts that constitute induced infringement, and would induce direct infringement, with knowledge of the '476 patent and with knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. Upon information and belief,

Defendant specifically intended that its actions would result in infringement of at least the specific claims identified above of the '476 patent, or subjectively believed that its actions would result in infringement of the '476 patent but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, after Defendant knew of the '476 patent, including by way of the notice described above.

123.    Because the asserted claims of the '476 patent are method claims, the marking requirement of 35 U.S.C. § 287 does not apply to them. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

124.    Defendant's infringing activities have been without authority or license under the '476 patent. Moreover, because GoPro continued its infringing conduct after being placed on notice of its infringement of the '476 patent, its infringement after receiving such notice was willful.

125.    Plaintiff has been damaged by Defendant's infringement of the '476 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty, including enhanced damages for Defendant's willful infringement.

## COUNT II – INFRINGEMENT OF THE '706 PATENT

126.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

127.    Defendant has directly infringed one or more claims of the '706 patent. For example, Defendant has infringed at least claim 1 of the '706 patent, either literally or under the doctrine of equivalents, in connection with at least its GoPro Hero 7 and Hero 8, as detailed in the preliminary claim chart attached hereto as Exhibit H and incorporated herein by reference.

128.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '706 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities described herein on the performance of that step as disclosed in Exhibit H. The accused functionality relates to the head-tracking functionality and corresponding hardware of the accused products (e.g., Defendant's GoPro Hero 7 and Hero 8), as set forth in Exhibit H. For example, on information and belief, a user could not use the functionality of the accused instrumentality as described in Exhibit H without performance of the steps recited in claim 1 of the '706 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit H. In other words, for a user to utilize the functionality described in Exhibit H, the steps of claim 1 of the '706 patent had to be performed in the manner described in Exhibit H. Otherwise, the head-tracking functionality of Defendant's accused instrumentalities (and the corresponding benefit) would not have been available to users.

129.    Because the asserted claims of the '706 patent are method claims, the marking requirement of 35 U.S.C. § 287 does not apply to them. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

130.    Defendant's infringing activities have been without authority or license under the '706 patent.

131.    Plaintiff has been damaged by Defendant's infringement of the '706 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty.

## COUNT III – INFRINGEMENT OF THE '086 PATENT

132.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

133.    Defendant has directly infringed one or more claims of the '086 patent. For example, Defendant has infringed at least claim 24 of the '086 patent, either literally or under the doctrine of equivalents, in connection with Defendant's GoPro Max 360 Camera, as detailed in the preliminary claim chart attached hereto as Exhibit I and incorporated herein by reference.

134.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '086 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities (e.g., Defendant's GoPro Max 360 Camera) described herein on the performance of that step as disclosed in Exhibit I. The accused functionality relates to the accused products' video processing functionality, as set forth in Exhibit I. On information and belief, a user of the accused instrumentalities could not use the functionality described in Exhibit I without performance of the steps recited in claim 24 of the '086 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit I. In other words, for a user to utilize the video processing functionality described in Exhibit I, the steps of claim 24 of the '086 patent had to be performed in the manner described in Exhibit I. Otherwise, the video processing functionality of the accused instrumentalities, and the corresponding benefit, would not have been available to users of the accused instrumentalities.

135.    Additionally, Defendant's affirmative acts of selling the accused products, causing the accused products to be sold, advertised, offered for sale, and/or distributed, and providing instruction, marketing, and/or installation materials for the accused products have induced Defendant's customers and/or end-users to use the accused products in their normal and customary way to infringe the '086 patent. Defendant specifically intended and was aware that these normal and customary activities would infringe the '086 patent. In addition, on information and belief, Defendant provided marketing, instructional, and/or installation materials that specifically taught end-users to use the accused products in an infringing manner. By way of example only, Defendant has induced infringement of at least the specific claims of the '086 patent identified above by selling in the United States, without Plaintiff's authority, infringing products and providing instructional, marketing, and/or installation materials. These actions have induced and continue to induce the direct infringement of the '086 patent by end-users. Defendant performed acts that constitute induced infringement, and would induce direct infringement, with knowledge of the '086 patent and with knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. Upon information and belief, Defendant specifically intended that its actions would result in infringement of at least the specific claims identified above of the '086 patent, or subjectively believed that its actions would result in infringement of the '086 patent but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, after Defendant knew of the '086 patent, including by way of the notice described above.

136.    Defendant's infringing activities have been without authority or license under the '086 patent. Moreover, because GoPro continued its infringing conduct after being placed on

notice of its infringement of the '086 patent, its infringement after receiving such notice was willful.

137.    Because the asserted claim of the '086 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

138.    Plaintiff has been damaged by Defendant's infringement of the '086 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty, including enhanced damages for Defendant's willful infringement.

## COUNT IV – INFRINGEMENT OF THE '250 PATENT

139.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

140.    Defendant has directly infringed one or more claims of the '250 patent. For example, Defendant has infringed at least claim 1 of the '250 patent, either literally or under the doctrine of equivalents, in connection with Defendant's GoPro Max 360 and Fusion Cameras, as detailed in the preliminary claim chart attached hereto as Exhibit J and incorporated herein by reference.

141.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '250 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities (e.g., Defendant's GoPro Max 360 and Fusion Cameras) described herein on the performance of that step as disclosed in Exhibit J. The accused functionality relates to the

accused products' video processing functionality, as set forth in Exhibit J. On information and belief, a user of the accused instrumentalities could not use the functionality described in Exhibit J without performance of the steps recited in claim 1 of the '250 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit J. In other words, for a user to utilize the video processing functionality described in Exhibit J, the steps of claim 1 of the '250 patent had to be performed in the manner described in Exhibit J. Otherwise, the video processing functionality of the accused instrumentalities, and the corresponding benefit, would not have been available to users of the accused instrumentalities.

142.    Additionally, Defendant's affirmative acts of selling the accused products, causing the accused products to be sold, advertised, offered for sale, and/or distributed, and providing instruction, marketing, and/or installation materials for the accused products have induced Defendant's customers and/or end-users to use the accused products in their normal and customary way to infringe the '250 patent. Defendant specifically intended and was aware that these normal and customary activities would infringe the '250 patent. In addition, on information and belief, Defendant provided marketing, instructional, and/or installation materials that specifically taught end-users to use the accused products in an infringing manner. By way of example only, Defendant has induced infringement of at least the specific claims of the '250 patent identified above by selling in the United States, without Plaintiff's authority, infringing products and providing instructional, marketing, and/or installation materials. These actions have induced and continue to induce the direct infringement of the '250 patent by end-users. Defendant performed acts that constitute induced infringement, and would induce direct infringement, with knowledge of the '250 patent and with knowledge, or willful blindness to the

probability, that the induced acts would constitute infringement. Upon information and belief, Defendant specifically intended that its actions would result in infringement of at least the specific claims identified above of the '250 patent, or subjectively believed that its actions would result in infringement of the '250 patent but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, after Defendant knew of the '250 patent, including by way of the notice described above.

143.    Defendant's infringing activities have been without authority or license under the '250 patent. Moreover, because GoPro continued its infringing conduct after being placed on notice of its infringement of the '250 patent, its infringement after receiving such notice was willful.

144.    Because the asserted claim of the '250 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

145.    Plaintiff has been damaged by Defendant's infringement of the '250 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty, including enhanced damages for Defendant's willful infringement.

## COUNT V – INFRINGEMENT OF THE '287 PATENT

146.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

147.    Defendant has directly infringed one or more claims of the '287 patent. For example, Defendant has infringed at least claim 1 of the '287 patent, either literally or under the doctrine of equivalents, in connection with Defendant's GoPro Video Recording with Cloud

Storage, as detailed in the preliminary claim chart attached hereto as Exhibit K and incorporated herein by reference.

148.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '287 patent. On information and belief, Defendant has performed all steps of this claim or, alternatively, to the extent a user performed any step, Defendant conditioned the user's use of the functionality of Defendant's accused instrumentalities (e.g., Defendant's GoPro Video Recording with Cloud Storage) described herein on the performance of that step as disclosed in Exhibit K. The accused functionality relates to the accused products' video recording, compression, and storage functionality, as set forth in Exhibit K. On information and belief, a user of the accused instrumentalities could not use the functionality described in Exhibit K without performance of the steps recited in claim 1 of the '287 patent. Defendant also controlled the manner and/or timing of the functionality described in Exhibit K. In other words, for a user to utilize the video recording, compression, and storage functionality described in Exhibit K, the steps of claim 1 of the '287 patent had to be performed in the manner described in Exhibit K. Otherwise, the video recording, compression, and storage functionality of the accused instrumentalities, and the corresponding benefit, would not have been available to users of the accused instrumentalities.

149.    Additionally, Defendant's affirmative acts of selling the accused products, causing the accused products to be sold, advertised, offered for sale, and/or distributed, and providing instruction, marketing, and/or installation materials for the accused products have induced Defendant's customers and/or end-users to use the accused products in their normal and customary way to infringe the '287 patent. Defendant specifically intended and was aware that

these normal and customary activities would infringe the '287 patent. In addition, on information and belief, Defendant provided marketing, instructional, and/or installation materials that specifically taught end-users to use the accused products in an infringing manner. By way of example only, Defendant has induced infringement of at least the specific claims of the '287 patent identified above by selling in the United States, without Plaintiff's authority, infringing products and providing instructional, marketing, and/or installation materials. These actions have induced and continue to induce the direct infringement of the '287 patent by end-users. Defendant performed acts that constitute induced infringement, and would induce direct infringement, with knowledge of the '287 patent and with knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. Upon information and belief, Defendant specifically intended that its actions would result in infringement of at least the specific claims identified above of the '287 patent, or subjectively believed that its actions would result in infringement of the '287 patent but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, after Defendant knew of the '287 patent, including by way of the notice described above.

150.    Defendant's infringing activities have been without authority or license under the '287 patent. Moreover, because GoPro continued its infringing conduct after being placed on notice of its infringement of the '287 patent, its infringement after receiving such notice was willful.

151.    Because the asserted claim of the '287 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

152.    Plaintiff has been damaged by Defendant's infringement of the '287 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty, including enhanced damages for Defendant's willful infringement.

## COUNT VI – INFRINGEMENT OF THE '818 PATENT

153.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

154.    Defendant has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '818 patent.

155.    For example, Defendant has directly infringed at least claim 1 of the '818 patent, either literally or under the doctrine of equivalents, in connection with Defendant's GoPro cameras with H.264/AVC encoding, as detailed in the preliminary claim charts attached hereto as Exhibit L and incorporated herein by reference.

156.    Additionally, Defendant's affirmative acts of selling the accused products, causing the accused products to be sold, advertised, offered for sale, and/or distributed, and providing instruction, marketing, and/or installation materials for the accused products have induced Defendant's customers and/or end-users to use the accused products in their normal and customary way to infringe the '818 patent. Defendant specifically intended and was aware that these normal and customary activities would infringe the '818 patent. In addition, on information and belief, Defendant provided marketing, instructional, and/or installation materials that specifically taught end-users to use the accused products in an infringing manner. By way of example only, Defendant has induced infringement of at least the specific claims of the '818 patent identified above by selling in the United States, without Plaintiff's authority, infringing

products and providing instructional, marketing, and/or installation materials. These actions have induced and continue to induce the direct infringement of the '818 patent by end-users. Defendant performed acts that constitute induced infringement, and would induce direct infringement, with knowledge of the '818 patent and with knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. Upon information and belief, Defendant specifically intended that its actions would result in infringement of at least the specific claims identified above of the '818 patent, or subjectively believed that its actions would result in infringement of the '818 patent but took deliberate actions to avoid learning of those facts, as set forth above. Upon information and belief, after Defendant knew of the '818 patent, including by way of the notice described above.

157.    Defendant's infringing activities have been without authority or license under the '818 patent. Moreover, because GoPro continued its infringing conduct after being placed on notice of its infringement of the '818 patent, its infringement after receiving such notice was willful.

158.    Plaintiff has been damaged by Defendant's infringement of the '818 patent, and Plaintiff is entitled to recover damages for Defendant's infringement, which damages cannot be less than a reasonable royalty, including enhanced damages for Defendant's willful infringement.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

A.    Entry of judgment that Defendant has infringed one or more claims of the '476 patent, and that this infringement has been willful,

B.    Entry of judgment that Defendant has infringed one or more claims of the '706 patent, and that this infringement has been willful,

C.    Entry of judgment that Defendant has infringed one or more claims of the '086 patent, and that this infringement has been willful,

D.    Entry of judgment that Defendant has infringed one or more claims of the '250 patent, and that this infringement has been willful,

E.    Entry of judgment that Defendant has infringed one or more claims of the '287 patent, and that this infringement has been willful,

F.    Entry of judgment that Defendant has infringed one or more claims of the '818 patent, and that this infringement has been willful,

G.    Damages in an amount to be determined at trial for Defendant's infringement, which amount cannot be less than a reasonable royalty, including but not limited to those acts not presented at trial, including enhanced damages for willful infringement, and an accounting of all infringing acts,

H.    Entry of judgment that this case is exceptional, and that Plaintiff be awarded all of its costs, expenses, and attorney's fees incurred in connection with this action,

I.    Pre-judgment and post-judgment interest on the damages assessed, and

J.    Such other and further relief, both at law and in equity, to which Plaintiff may be entitled and which the Court deems just and proper.

This 16th day of January, 2025.

/s/ Richard C. Weinblatt
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
STAMOULIS & WEINBLATT LLC
800 N West Street, Third Floor
Wilmington, DE 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688
stamoulis@swdelaw.com
weinblatt@swdelaw.com

*Of Counsel:*
Cortney S. Alexander
  cortneyalexander@kentrisley.com
  Tel: (404) 855-3867
  Fax: (770) 462-3299
KENT & RISLEY LLC
5755 N Point Pkwy Ste 57
Alpharetta, GA 30022

Attorneys for Plaintiff